UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ALBERTA BOWRIN, et al.,

              Plaintiffs,

              - against -

CATHOLIC GUARDIAN SOCIETY,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                        04 Civ. 1258 (RJH)

              **<u>MEMORANDUM OPINION</u>**
                   **<u>AND ORDER</u>**

       This opinion replaces an opinion previously issued on February 22, 2006 [70] that contained a typographical error significant to the disposition of the case.

       In this action, plaintiffs, nine current or former employees of defendant Catholic Guardian Society ("CGS"), seek payment under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* (2000) ("FLSA" or "the Act"), of unpaid overtime premium wages for hours in excess of forty hours per week. Plaintiffs further seek liquidated damages in an amount equal to the unpaid wages, pursuant to 29 U.S.C. § 216(b), and application of a three-year statute of limitations under 29 U.S.C § 255(a). Finally, individual plaintiff Lisa Rogers alleges a claim for breach of contract, for CGS's failure to pay two weeks' salary in lieu of two weeks' notice upon her termination.

       The parties have each filed separate motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, disputing primarily whether, as a matter of law, defendant is subject to coverage under the FLSA. For the reasons set forth below, the parties' motions are granted in part and denied in part.

# BACKGROUND

Unless otherwise indicated, the following facts are undisputed.

CGS is a nonprofit organization dedicated to the service of families and children, with funding derived from federal, state, and local reimbursements and grants. (Breidenbach Aff. ¶ 7; Longley Aff. (May 20, 2005) ¶ 14.) Founded in 1908, CGS originally served as an aftercare agency, providing transition services to children who were released from other homes. (Frein Dep. 70:21–71:05 (Mar. 23, 2005) ("Frein Dep. I"), Pls.' Ex. A.) In the 1960s, CGS began providing foster care services through foster boarding home placements and residential group homes. (*Id.* at 71:06–71:11.) CGS currently maintains approximately forty residential and nonresidential facilities in Staten Island, Manhattan, the Bronx, Queens, Brooklyn and Suffolk County, New York. (Breidenbach Aff. ¶ 2.) CGS presently operates two residential programs, the Mental Retardation and Developmental Disabilities ("MRDD") program for mentally retarded individuals (Frein Aff. ¶ 9) and the Congregate Care program for foster youth (Frein Dep. I at 70–71).

I.      The MRDD Program

In about 1978, CGS began its MRDD program (Frien Aff. ¶ 9) which provides residential care for diagnosed mentally retarded persons (Longley Dep. 52:20–52:23, Pls.' Ex. C). This program is separately licensed and reimbursed by the state with funding provided by New York State Office of Mental Retardation and Developmental Disabilities. (Longley Aff. (May 20, 2005) ¶ 13; Briedenbach Dep. 86–87, Pls.' Ex. D.) There are twenty-four group homes in CGS's MRDD program, with 167 available beds, presently serving 165 adolescents and adults. (Longley Dep. 100:23–101:10; Longley

Aff. (May 20, 2005) ¶ 4.)  For the 2004 fiscal year, MRDD's revenues of $18,440,484 accounted for forty-eight percent of CGS's total gross revenues of $38,446,543.  (*See* Def.'s Resp. to Interrog. 9c ("CGS Standards of Payment"), Pls.' Ex. Y.)  A diagnosis of mental retardation or developmental disabilities is a prerequisite to admission into an MRDD facility.  (Longley Dep. 52:20–52:23.)  An individual (or her advocate or guardian) must apply for residential or respite care services from an MRDD-operated developmental services office.  (*Id.* at 52:24–53:03.)  CGS then gathers diagnostic assessments performed by physicians for the individual.  (*Id.* at 53:09–12.)  The diagnostic assessments are first reviewed by Tim Carey, the director of the MRDD program, who will make a recommendation and forward it to Craig Longley, CGS's Associate Executive Director.  (*Id.* at 53:19–54:08.)  The final decision regarding the appropriateness of an individual's admission into the program is made by Longley.  (*Id.*)

MRDD group homes are regularly staffed with resident nurses, social workers, and periodically, psychologists.  (Longley Dep. 61:04–61:08.)  In addition, MRDD staffs direct care workers who "oversee the routine care and treatment of the consumers in the facilities . . . ."  (*Id.* at 92:05–92:07.)  "Some of [these direct care workers] are trained to administer medications . . . , [and] to record in documents consumers' behaviors, [and] their response to medications . . . ."  (*Id.* at 92:23–93:02.)

In 1984, the U.S. Department of Labor ("DOL") audited CGS and determined that the MRDD program was covered by DOL overtime regulations.  (Frien Dep. I at 97:20–98:20.)  As a result, CGS paid retroactive overtime wages and began paying MRDD nonexempt employees an overtime premium, a practice it continues to this day.  (*Id.*; Briedenbach Dep. 22:21–23:12.)

II.     CGS's Child Welfare Services

In addition to its MRDD program, CGS provides a comprehensive range of child welfare services to approximately 835 children.  (Longley Aff. (May 20, 2005) ¶ 2.) These services are administered through community-based private foster homes, community-based child abuse and neglect prevention programs, and residential group homes.[1]  (*Id.*)  Children are referred to CGS for child welfare service by the New York City Administration for Children's Services ("ACS").  (Longley Dep. 54:12–54:17.) CGS provides a range of placement options for foster children, including (but not limited to) placing them in private homes with individual foster families ("foster boarding homes") or in residential group homes operated by CGS staff.  (Longley Dep. 56:23– 57:24.)

Prior to making a referral, ACS's clinical staff and child evaluation specialists make a clinical assessment of the child.  (Longley Dep. 54:18–56:02.)  The ACS child evaluation specialist will specify in her referral in which program the child should be placed.  (*Id.* at 56:06–56:12.)  On CGS's end, the intake coordinator will determine the appropriateness of the referral for placement in a particular CGS facility, based on her own judgment, consultation with the Congregate Care director Sunday Odua and/or his superior, Director of Residential Treatment Services, Dr. Gerrie Goldfarb, and the clinical assessment provided by ACS in its referral.  (Longley Dep. 54:24–56:05.)  CGS

---

[1] CGS's child welfare services include an Independent Living program, an aftercare program, a Prevention program, a Foster Boarding Home program, a Therapeutic Foster Care Boarding Home program, and a Foster Care Boarding Homes for AIDS (Special Foster Care Boarding Homes).  (Longley Dep. 102:05– 103:13, 105:24–106:07.)  These programs are not residential programs and are *not* a part of CGS's Congregate Care program.  (*Id.*)  Although the Foster Boarding Home programs (regular, therapeutic, and special) are *not* considered part of the residential programs operated by CGS (which are limited to the MRDD and Congregate Care programs), there are approximately 460 beds available through these homes. (*Id.* at 107:23–109:20.)  The nonresidential services, taken together, serve approximately 699 children. (Longley Aff. (May 20, 2005) ¶ 6.)

will make a recommendation as to what facility it believes to be appropriate, based on bed availability and its own view of the provided clinical assessment, but ACS makes the final decision. (*Id.* at 59:05–59:16.)

Congregate Care

CGS's residential group homes constitute the Congregate Care program, which is also known as CGS's "residential treatment services program." (*See* Pls.' Ex. T.) Congregate Care serves approximately 136 children. (Longley Aff. (May 20, 2005) ¶ 6.) Of the twelve Congregate Care group homes in CGS, three are regular group homes, six are designated "Hard-to-Place" group homes, two are Mother-Child facilities, and the last is a nonsecured detention group home. (Longley Dep. 97:18–99:08; Breidenbach Dep. 70:09–70:11.) CGS began operating its two types of Hard-to-Place homes, called Assertive Community Treatment ("ACT") homes and Rapid Assessment ("RA") homes, in 2002. (Longley Dep. 59:22–60:11, 80:02–80:09; *see also* Def.'s Resp. to Interrog. No. 9, Pls.' Ex. MM.) The function of ACT and RA homes is discussed in greater detail below. Of the six Hard-to-Place homes, four are ACT homes with thirty-eight available beds, and two are RA homes with twenty available beds. (Longley Dep. 98:17–99:08.) The Congregate Care program's total revenues for the fiscal year of 2004 were $12,383,741, or approximately thirty-two percent of CGS's total gross revenues. (*See* CGS Standards of Payments; Frein Dep. I at 51:04–51:09.) The Hard-to-Place homes generated a total of $4,369,361 in regular and $1,787,606 in Medicaid revenue, for a total of $6,156,967 or approximately fifteen percent of CGS's gross revenues. (CGS Standards of Payments; Breidenbach Dep. 73:25–74:03.) Of the Hard-to-Place revenues, two-thirds or around $4,104,645 were attributable to the four ACT homes. (Briedenbach

Dep. 70:03–70:11.)  The ACT program, therefore, accounts for approximately one-third of the Congregate Care program's total revenue.

A.  Regular Group Homes

CGS's three regular group homes are designated for abused and neglected children that ACS has determined "cannot function in a family setting safely or appropriately, and . . . require residential placement where they can be observed and monitored and put through structured behavior modification systems in order to correct their behavior."  (Longley Dep. 68:02–68:12.)  As of March 2005, the approximate number of children residing in CGS's three regular group homes was twenty-two.  (*Id.* at 72:08.)  There are thirty-two total available beds.  (*Id.* at 98:05.)  The regular group homes are permanently staffed by group home supervisors and child care workers, and periodically staffed with a substance abuse counselor, an applied behavior scientist, a case worker, a social worker supervisor, and a part-time registered nurse.  (*Id.* at 72:18–25.)  Defendant does not dispute there is a therapeutic element to services provided in the regular group homes.  (*Id.* at 73:03–73:09; Odua Dep. 94:23–95:05.)  The responsibilities of child care workers generally include ensuring school attendance, administration of medication, transportation to activities, such as recreation, visits with biological and foster care families, reviews with ACS, and medical appointments.  (Pls.' 56.1 Statement ¶ 21.)  Child care workers are also responsible for cleaning and securing the home, and purchasing and providing for the daily necessities of the residents.  (*Id.*)  None of the Congregate Care staff receive an overtime premium for hours worked in excess of forty in a week.  (Def.'s Resp. to Pls.' Req. for Admis. No. 70–71, Pls.' Ex. S.)

B.  Hard-to-Place Homes

ACT and RA group homes are designed for residents with "behaviors that are typically not able to be cared for in a regular group home program or in a foster family program." (Longley Dep. 60:08–60:11.)  These facilities "have more staffing [and] more clinical staff than regular group home[s] to support in the treatment plan of the resident." (Odua Dep. 100, Pls.' Ex. E.)  ACT and RA homes staff psychiatrists, psychologists, social workers, RNs, and individual group and family therapists who monitor residents' mental health status.  (Longley Dep. 61:19–61:25.)  When ACS refers a child to an ACT group home, the referral includes a plan placement package that indicates what kind of diagnosis, if any, the child has.  (Odua Dep. 115:21–115:04.)  In most cases children referred to the Hard-to-Place homes have some type of psychological, medical, or behavioral diagnosis.  (*Id.* at 116:08–116:16.)  RA group homes are for foster care youth referred by ACS "for intensive short-term diagnostic assessment to determine if they can safely return home with community-based services, or if they need to remain in out-of-home care and receive a different type of placement." (Longley Dep. 83:11–83:17.)  RA residents remain in a RA group home for ninety days, during which time the previously mentioned "diagnostic assessment" is made.  (Odua Dep. 101:07–101:21.)

According to Longley's original deposition testimony, ACT group homes are "specifically geared to care for children with severe mental illness." (Longley Dep. 59–60, Pls.' Ex. C.)  Longley also testified that with the ACT program, CGS "specifically sought to care for a severely mentally ill population.  And that's our intent." (*Id.* at 85:23–86:02.)  In addition to children with severe mental illness, CGS will accept into ACT homes some children designated by ACS as Hard-to-Place but not necessarily

mentally ill.  (*Id.* at 60:03–60:06.)  A child might be considered Hard-to-Place because of

"a history of AWOL behavior, conduct disorder, [or] criminal behaviors."  (*Id.* at 60:06–

60:08.)  Longley wrote the staff manual for the ACT program.  (*Id.* at 129:25–30:10;

*Catholic Guardian Society Assertive Community Treatment Program Staff Manual*

("*ACT Staff Manual*"), Pls.' Ex. X.)  The manual states that the "ACT Program is

intended to be a community-based alternative to the hospital, delivering the equivalent of

the hospital's comprehensive services directly to the adolescent in the community."

(*ACT Staff Manual*.)  The ACT program was developed in part to respond to a growing

need in the New York City foster care system for "children with severe mental illness and

moderate behavioral health conditions," following the trend of deinstitutionalizing the

mentally ill in the 1950s.  (*Id.*)

After consulting with counsel Longley requested that he be able to amend his

deposition testimony regarding the nature of the population served in the ACT group

home program (Longley Dep. 87:06–87:25).  He amended it to state that the program's

> fundamental purpose is to care for abused and neglected children or
> persons in need of supervision who happen to have severe mental illness,
> as opposed to that its primary intent is to care for severely mentally ill
> children. . . . It would have to be a child who is abused or neglected or a
> person in need of supervision, in the first instance.

(*Id.* at 87:13–87:22.)  Likewise, Longley states in his affidavit in opposition to plaintiffs'

motion for summary judgment that the "primary purpose of ACT and RA homes is to

help children who are abused, neglected, or who are designated as Persons in Need of

Supervision.  While some of such children may also have a mental or behavioral disorder,

such disorders are incidental to the reason for their admission."  (Longley Aff. (July 29,

2005) ¶ 14.)

The percentage of children residing in an ACT home who have a severe mental illness ranges from fifty and seventy-five percent. (Longley Dep. 82:17–82:23.) Longley explained that his use of the term "severe" in describing the types of mental illnesses suffered by ACT residents refers to type rather than degree: "For example, a resident with schizophrenia would be considered 'severely mentally ill.'" (Longley Aff. (July 29, 2005) ¶ 18.) Among the types of mental or behavioral disorders with which "many" ACT residents are diagnosed are: schizophrenia, bipolar disorder, Attention Deficit Hyperactivity Disorder, conduct disorder, adjustment disorder, oppositional defiant disorder, disruptive behavior disorder, clinical depression, substance abuse, and mood disorder. (Odua Dep. 116:19–116:24; Longley Aff. (July 29, 2005) ¶ 7.) In response to plaintiffs' request for individual case files of children currently or previous placed in ACT or RA homes, CGS provided ninety-eight files. (Burky Aff. ¶ 2.) Of the forty-six individuals who could be identified as currently or formerly residing in an ACT home, forty-one (approximately ninety percent) had an Axis I or Axis II diagnoses (Burky Aff. ¶¶ 3, 6) according to the multiaxial assessment format used by the American Psychiatric Association to identify "mental disorders" ranging from learning disorders to retardation.[2]

---

[2] The diagnoses contained in the case files follow the multiaxial format contained in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., text rev. 2000) ("DSM-IV-TR"). (Burky Aff. ¶ 3.) According to this manual, Axis I lists "clinical disorders" and "other conditions that may be a focus of clinical attention." (Weiner Dec. ¶ 5.) These include learning disorders, developmental disorders, eating disorders, cognitive disorders (like delirium or dementia), substance-related disorders (like drug abuse or medical disorders related to the abuse of drugs), schizophrenia and other psychotic disorders, and mood and anxiety disorders. *See* DSM-IV-TR Diagnostic Classification, *partially available at* http://www.behavenet.com/capsules/disorders/dsm4TRclassification.htm. Axis II lists personality disorders and mental retardation. *Id.*

**DISCUSSION**

I.     Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997) (quoting Fed. R. Civ. P. 56(c)). In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48 (emphasis in original). In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Id.* at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Specifically, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256-57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002). "A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003) (quoting *Anderson*, 477 U.S.

at 248). "A fact is 'material' if it might affect the outcome of the suit under governing law." *Id*. (quoting *Anderson*, 477 U.S. at 248).

Summary judgment may also be granted when the opposing party fails to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. See *Celotex*, 477 U.S. at 321. Indeed, summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case." *Distasio v. Perkin Elmer Corp*., 157 F.3d 55, 61 (2d Cir. 1998). Where, as here, parties submit cross motions for summary judgment, the standard is the same as that for individual motions. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *SEC v. Eberhard*, 2005 WL 17640, at *3 (S.D.N.Y. Jan. 3, 2006).

II.      The Statutory Scheme

Courts construe the FLSA "liberally to apply to the furthest reaches consistent with congressional direction." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985) (internal quotation marks and citation omitted). The Department of Labor's ("DOL") regulations, which provide "[g]uiding principles for applying coverage and exemption provisions," state that "[i]t is clear that Congress intended the Fair Labor Standards Act to be broad in its scope." 29 C.F.R. § 799.101. Moreover, an employer who claims an exemption under the Act has the burden of showing that it applies. *Id.* (citing *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290 (1959); *Walling v. General Indus. Co.*, 330 U.S. 545 (1947); *Fleming v. Hawkeye Pearl Button Co.*, 113 F.2d 52 (8th Cir. 1940)); *see also Bilyou v. Dutchess Beer Distrib., Inc.*, 300 F.3d 217, 222 (2d Cir. 2002) (recognizing the "exemptions under the FLSA are 'narrowly construed against the employers seeking to assert them and their application limited to those establishments

plainly and unmistakably within their terms and spirit,'" and that "[t]he burden of invoking these exemptions rests upon the employer") (citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 394 n.11 (1960); *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991)).

This litigation concerns Section 7 of the FLSA, which provides that "no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours unless such employee receives" an overtime premium wage of time and a half. 29 U.S.C. § 207(a)(1). An employer is therefore subject to the FLSA's maximum hours provision if either of two conditions exist: (1) if the employee individually was "engaged in commerce or in the production of goods for commerce," or (2) the employer was an "enterprise" "engaged in commerce or in the production of goods for commerce," regardless of whether the individual employee was so engaged. *Id.*; 29 C.F.R. § 779.100; *see also Joles v. Johnson County Youth Svc. Bureau, Inc.*, 885 F. Supp. 1169, 1173–74 (S.D. Ind. 1995). These bases for coverage under the FLSA are referred to as "individual" or "enterprise" coverage, respectively. *See Tony & Susan Alamo Found.*, 471 U.S. at 295 n.8 ("Employment may be covered under the Act pursuant to either 'individual' or 'enterprise' coverage.").

A. Enterprise Coverage

The 1961 amendments to the FLSA broadened its coverage by providing that *all* employees in a particular business unit that constitutes an "enterprise," are covered by the Act, irrespective of their individual coverage status. Fair Labor Standards Amendments

of 1961, Pub. L. No. 87-30, 75 Stat. 65 (codified in scattered sections of 29 U.S.C.).  The

"enterprise" is statutorily defined as follows:

> (r)(1) <u>"Enterprise" means the related activities performed</u> (either through
> unified operation or common control) <u>by any person</u> or persons <u>for a</u>
> <u>common business purpose</u>, and includes all such activities whether
> performed in one or more establishments or by one or more corporate or
> other organizational units including departments operated through leasing
> arrangements, but shall not include the related activities performed for
> such enterprise by an independent contractor.

29 U.S.C. § 203(r)(1) (emphasis supplied).  The regulations promulgated by the

Department of Labor note an important distinction between an "enterprise,"

"establishment," and "employer":

> As defined in the Act, the term *enterprise* is roughly descriptive of a
> business rather than of an establishment or of an employer although on
> occasion the three may coincide.  The enterprise may consist of a single
> establishment (see § 779.204(a)) which may be operated by one or more
> employers; or it may be composed of a number of establishments which
> may be operated by one or more employers (see § 779.204(b)).  The
> enterprise is not necessarily coextensive with the entire business activities
> of an employer, a single employer may operate more than one enterprise
> (see § 779.204(c)).  The Act treats as separate enterprises different
> businesses which are unrelated to each other even if they are operated by
> the same employer.

29 C.F.R. § 779.203 (references in original).  The Fourth Circuit has reduced the

definition of an "enterprise" to a three-part test for determining whether an entity or

entities is subject to coverage under the FLSA.  *Dole v. Odd Fellows Home Endowment*

*Bd.*, 912 F.2d 689, 692 (4th Cir. 1990).  This test requires that "1) the entity or entities

must engage in 'related activities,' 2) performed through 'unified operation' or 'common

control,' 3) for a common business purpose."  *Id.*; *see also* 29 C.F.R. § 779.202 ("The

definition makes clear that the enterprise includes all such related activities which are

performed through 'unified operation' or 'common control.'  This is true even if they are

performed by more than one person, or in more than one establishment, or by more than one corporate or other organizational unit.").

i. <u>Related Activities</u>

Activities are considered "related" for purposes of the Act "when they are the same or similar, such as those of the individual retail or service stores in a chain. . . . They are also 'related' when they are auxiliary and service activities . . . [or] when they are part of a vertical structure . . . ." 29 C.F.R. § 779.206(a) (citing S. Rep. No. 87-145, at 41 (1961), *reprinted in* 1961 U.S.C.C.A.N. 1620); *see also Odd Fellows*, 912 F.2d at 692 (citing DOL regulation). The DOL regulations also advise that "[g]enerally, the answer to the question whether particular activities are 'related' or not, will depend in each case on whether the activities serve a business purpose common to all the activities of the enterprise." § 779.206(b). In circumstances where different entities are involved, "the critical inquiry is 'operational interdependence in fact.'" *Odd Fellows*, 912 F.2d at 692. The provision of "mutually supportive services to the substantial advantage of each entity are operationally interdependent and may be treated as a single enterprise under the Act." *Archie v. Grand Cent. P'Ship, Inc.*, 997 F. Supp. 504, 525 (S.D.N.Y. 1998) (citing *Odd Fellows*, 912 F.2d at 692–93). Finally, "[c]ommon ownership standing alone does not bring unrelated activities within the scope of the same enterprise. . . . However, if it appears that there is a reasonable relationship of all the activities to a single business purpose a different conclusion might be warranted." 29 C.F.R. § 779.211.

ii. <u>"Unified Operation" or "Common Control"</u>

As noted by the DOL, "[t]he terms 'unified operation' and 'common control' do not have a fixed legal or technical definition." 29 C.F.R. § 779.216. "Unified operation"

"means combining, uniting, or organizing [related activities'] performance so that they are in effect a single business unit or an organized business system . . . ." 29 C.F.R. § 779.217. According to the DOL regulations, "control" includes the "power to direct, restrict, regulate, govern, or administer the performance of the activities." 29 C.F.R. § 779.221. "'Common' control includes the sharing of control and it is not limited to sole control or complete control by one person or corporation." *Id.*

iii. Common Business Purpose

As a general matter, activities performed by nonprofit entities such as CGS are not considered to be conducted for a common business purpose unless they engage in commercial activity. *See Tony & Susan Alamo Found.*, 471 U.S. at 297 n.14. However, in addition to activity commonly understood to be performed for a "business purpose," such as commercial activity in competition with other private entrepreneurs, *see Tony & Susan Alamo Found.*, 471 U.S. at 296; 29 C.F.R. § 779.214 (2002), the FLSA also deems certain specified activities to be performed for a business purpose. Specifically, activities performed

> in connection with the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a pre-school, elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution or school is operated for profit or not-for-profit . . . shall be deemed to be activities performed for a business purpose.

29 U.S.C. § 203(r)(2)(A) (emphasis supplied).

If CGS, or any part thereof, constitutes an "enterprise" because it has a business purpose under the foregoing definition, that enterprise will be subject to the overtime requirements of Section 7 of the FLSA if it is also found to be "engaged in commerce."

An enterprise is engaged in commerce where, *inter alia*, it "is engaged in the operation of … an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution . . . ." 29 U.S.C. § 203(s)(1)(B).

B.  The Parties' Positions[3]

Plaintiffs' claim that they are entitled to overtime wages under the FLSA's enterprise coverage provision.  They posit three separate and alternative arguments in support of their position.   First, they argue MRDD and Congregate Care perform related activities and are therefore a single enterprise.  Second, even if MRDD and Congregate Care are not related, plaintiffs argue that CGS as a whole is an enterprise because it is primarily engaged in the provision of residential care to the mentally ill and mentally retarded.  To support this proposition, plaintiffs point to the fact that more than half of CGS's overall budget is attributable to the MRDD, ACT and RA homes.  Finally, plaintiffs argue that even if neither of those theories support enterprise coverage, each of the four ACT homes are primarily engaged in the provision of residential care to the mentally ill.  Defendant disputes each of these arguments.  Defendant's position is that it does not engage in any activities giving rise to enterprise coverage under the FLSA, and it is therefore not subject to its overtime provision.

Having reviewed the parties' arguments, the statutory text, the relevant case law, and the Department of Labor's interpretation of the Act, the Court finds that CGS's ACT program is an enterprise engaged in commerce as defined in the FLSA, and therefore

---

[3] The following abbreviations are used to refer to the parties various supporting memoranda:  Plaintiffs' Memorandum in Support of its Motion for Summary Judgment ("Pls.' Supp. Mem."); Defendant's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s Opp'n Mem."); Plaintiff's Reply Memorandum in Support of its Motion for Summary Judgment ("Pls.' Reply Mem."); Defendant's Memorandum in Support of its Motion for Summary Judgment ("Def.'s Supp. Mem."); Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pls.' Opp'n Mem."); Defendant's Reply Memorandum in Support of its Motion for Summary Judgment ("Def.'s Reply Mem.").

subject to its overtime provision.  The Court is not persuaded, however, that MRDD and Congregate Care perform related activities, or that CGS as a whole is a single enterprise within the meaning of the FLSA.

III.     The ACT Program is an Enterprise Covered by the FLSA

Plaintiffs do not contend that the four ACT homes constitute a single "enterprise" under the three-pronged test that incorporates (1) related activities, (2) that are under common control, (3) and are performed for a common business purpose.  Rather, plaintiffs argue that each home is a separate "institution" that is "primarily" engaged in the care of the mentally ill and, therefore, is "engaged in commerce" under Section 7. (Pls.' Supp. Mem. 25; Pls.' Reply Mem. 2–3.)  Defendants take issue by arguing that each home is not a separate institution since they are subject to overall control by CGS and are only one of the several foster-care programs operated by CGS.  (Def.'s Opp'n Mem. 7.)

To the Court's mind, both contentions miss the mark.  Plaintiffs confuse the term "institution" with "enterprise."  Only enterprises are covered by the FLSA and if an individual home, or the four homes as a unit do not meet the statutory definition of enterprise, then coverage must be denied.  For its part, CGS mistakenly attempts to use the "common control" factor as a shield to enterprise coverage.  According to defendant, a finding that CGS exercises common control over various sets of related activities would preclude a finding that any of those related activities constitutes a separate enterprise under the Act.  As discussed above, common control (or unified operation) is one of the prerequisites to finding a covered enterprise, along with the performance of related activities and a common business purpose.  *See* 29 U.S.C. § 203(r)(1); 29 C.F.R. §

799.202; *Odd Fellows*, 912 F.2d at 692.  However, there is no basis for concluding that when multiple activities share common control, a subset of those activities cannot constitute a separate enterprise for purposes of determining coverage under the Act.  The *presence* of common control simply does not define what *cannot* be deemed an enterprise.  This is clear from the text of the regulations interpreting the Act which specifically note that "[t]he enterprise is not necessarily coextensive with the entire business activities of an employer, a single employer may operate more than one enterprise."  29 C.F.R. § 799.203.

Applying the three-prong test for enterprise, the Court perceives no difficulty in concluding first that all four ACT homes constitute a single enterprise.  To begin with, they clearly perform related activities.  Indeed, they perform identical activities.  Nor can it seriously be questioned that they are subject to common control, even if it is also true, as defendant contends, that other activities, some of which may not be related or conducted for a common business purpose, are also subject to the same common control.

This leaves, then, the last prong of the enterprise test, whether the four ACT homes are operated for a common business purpose.  This factor appears to have two aspects:  the purpose must be business in nature and it must be common to each home.  The issue of commonality is easily met as the homes have an identical purpose.  However, whether that purpose is a business purpose is not so readily resolved.  As noted, business purpose is defined in the Act to include, *inter alia*, "the operation of … an institution primarily engaged in the care of … the mentally ill or defective who reside on the premises of such institution …."  29 U.S.C. § 203(r)(2)(A).  Defendant contends that the ACT homes are primarily engaged in the care of neglected and abused children,

not in the care of the mentally ill.  Defendant relies primarily on *Brennan v. Harrison County, Mississippi*, 505 F.2d 901 (5th Cir. 1975), to support this interpretation of the term "primarily engaged."  In *Harrison County*, the Secretary of Labor argued that because a county home for the indigent housed residents who were nearly all old and/or ill, enterprise coverage under Section 3(s) applied.  The Fifth Circuit disagreed, finding that "[t]he sole primary, essential, fundamental authority and purpose for this home was the care of the indigent.  Indigency, not illness or age, was the 'indispensable prerequisite' for the operation of the home."  *Id.* at 904.  That the inmates were old or ill was an "incidental," not a primary factor.  *Id.* at 903–04.  Based on this language, CGS argues that because there are *some* ACT residents without mental illness diagnoses, mental illness cannot be an "indispensable prerequisite" for admission into an ACT home, and the ACT homes therefore cannot be primarily engaged in providing the mentally ill with residential care.  (Def.'s Opp'n Mem. 6.)

Defendant, however, is reading *Harrison County* too broadly and the FLSA too narrowly.  In *Harrison County*, the home in question was created by the county pursuant to authority granted by the Mississippi legislature to provide homes for "the relief and support of the poor."  505 F.2d at 902 (internal quotation marks omitted).  There was a "fixed public policy with reference to county homes" to provide "succor for those who, by reason of their poverty, are unable to supply themselves with the ordinary necessities of life, such as food, clothing, and shelter, including medicine and medical attention when needed."  *Id.* at 903.  The single, solitary and indispensable prerequisite for admission into the home was poverty, and the fact that the residents were predominantly old and sick was truly "incidental."  *Id.*  CGS asserts that the ACT Program's primary

purpose is to help abused and neglected children, and that to the extent those children have a mental or behavioral disorder, the diagnoses are simply "incidental" to the actual reason for their admission. (Longley Aff. (July 29, 2005) ¶ 14.) This claim, however, is not supported by the record. Notwithstanding CGS's general commitment to providing care and services to neglected and abused children, fundamental to ACT's mission is the treatment of mental illness, and a child's mental-health status is, in fact, a significant factor to their referral to the program. (Longley Dep. 59–60 (ACT program "sought to care for a severely mentally ill population").) CGS's staff manual for the ACT program describes it as created specifically to address the needs of children with severe mental health and moderate behavioral health conditions. (Pls.' Ex. X.) The program employs psychiatrists, psychologists, social workers and nurses to attend to the residents' mental health needs. (Longley Dep. 61:19–61:25.) Based on available records, almost all children residing in ACT homes (some ninety percent) have some mental health diagnosis. (Burky Aff. ¶ 6.) And by defendant's own admission, fifty to seventy-five percent of ACT residents suffer from a "severe mental illness." (Longley Dep. 82:17–82:23.)

Defendant's proposed application of the "indispensable prerequisite" standard ignores the distinguishing features of the ACT program. A specialized group of homes specifically designed to serve a mentally ill portion of a larger population of foster children within the care of a complex multi-service child care organization simply does not fit neatly into the *Harrison County* court's analysis. To the contrary, the instant case is more analogous to the facts in *Odd Fellows*. In that case, there were also multiple criteria for admission into the home in question. Although the individuals had to be

impoverished, infirmity or age was also integral to acceptance into the home. 912 F.2d at 695 (citing *Marshall v. Sunshine & Leisure, Inc.*, 496 F. Supp. 354, 357–58 (D. Fla. 1980), in which the court found that a home indeed "cared" for the aged and noted that the fact "[t]hat some of the residents may not need or request all of the services provided by defendants' employees does not affect the characterization of the services defendants make available to their residents"). Because the reality was that infirmity or age was an important factor in determining admission, and because the inhabitants of the home were in fact all elderly, the court found the home to be covered notwithstanding the requirement that all the inhabitants be impoverished. *Id.*

That there may be a handful of residents in ACT homes without a mental illness does not alter the fact that the homes were created specifically to address the needs of neglected children with mental illnesses and that mental illness is a significant factor in determining admission, as was age and infirmity in *Odd Fellows*. Taking together the ACT program's purpose, the nature of the population it serves, the type of care it provides, and the factors considered for admission, the Court finds that it is "primarily engaged" in providing residential care to the mentally ill, and therefore is operated for a business purpose under the Act.

This conclusion is consistent with the DOL's approach, which looks at the nature and amount of services provided in order to determine whether an institution is "primarily engaged" in providing residential care to the sick, aged, or mentally ill. Because the DOL's Wage and Hour Division ("WHD") is the primary federal authority entrusted with determining the FLSA's scope, its interpretations, "'while not controlling upon the courts by reason of their authority, do constitute a body of experienced and

informed judgment to which the courts and litigants may properly resort for guidance.'"

*Reich v. Miss Paula's Day Care Ctr., Inc.*, 37 F.3d 1191, 1194 (6th Cir. 1994) (citing

*Mabee v. White Plains Publ'g Co.*, 327 U.S. 178, 182 (1946); *Skidmore v. Swift & Co.*,

323 U.S. 134, 140 (1944)).  The WHD has articulated two possible means of deciding the

"primarily engaged" question.  One turns on the percentage of persons residing on the

premises with a mental health diagnosis, the other turns on the percentage of revenue

attributable to the care of the mentally ill.

According to an opinion letter issued by the WHD, "[t]he enterprise provision of

the FLSA generally does not cover a private non-profit institution providing care for . . .

neglected children, unless that institution is operated as . . . an institution primarily

engaged in the care of the . . . mentally ill or defective who reside on the premises of such

institution."  Opinion Letter No. FLSA2005-8NA of Sept. 2, 2005, *available at*

http://www.dol.gov/esa/whd/opinion/FLSANA/2005/2005_09_02_8NA_FLSA.pdf.  The

letter further instructs that a non-profit is so engaged where "not fewer than 50% of the

children residing with the organization were admitted by a qualified physician,

psychiatrist, or psychologist."  *Id.* (citing U.S. Dep't of Labor, Employment Standards

Admin., Wage & Hour Div., *Field Operations Handbook* § 12g12 (1990), *available at*

http://www.dol.gov/esa/whd/FOH/FOH_Ch12.pdf.)[4]  "The term 'admitted' includes

evaluations of mental or emotional disturbance by such a qualified practitioner, either

subsequent to or preceding admission, as the cause for referral."  *Id.* (citing same).  As

indicated by the opinion letter's citation to it, this test is also articulated in WHD's Field

Operations Handbook ("FOH").  The FOH is an operations manual that provides WHD

---

[4] The FOH is also available on the Lexis search engine.  The citation for the chapter cited here is FOH 2.12g.

investigators and staff with interpretations of statutory provisions, procedures for

conducting investigations, and general administrative guidance.  *See Samson v. Apollo

Res., Inc.*, 242 F.3d 629 (5th Cir. 2001) (stating that WHD materials should be given

"substantial weight") (citation omitted); *Picton v. Excel Group, Inc.*, 192 F. Supp. 2d 706

(D. Tex. 2001) (rejecting defendant-employer's interpretation of statute because directly

contradicted by FOH, and basing its interpretation of statute on FOH, along with

language of FLSA and regulations).  The FOH contains the second method for

determining the "primarily engaged" question.  It defines institutions "primarily engaged

in the care of . . . the mentally ill or defective residing on the premises" as follows:

> Such an institution (other than a hospital) is an institution primarily
> engaged in (i.e., more than 50% of the income is attributable to) providing
> domiciliary care to individuals who reside on the premises and who, if
> suffering from physical or mental infirmity or sickness of any kind, will
> require only general treatment or observation of a less critical nature than
> that provided by a hospital.  Such institutions are not limited to nursing
> homes, whether licensed or not licensed, but include those institutions
> generally known as nursing homes, rest homes, convalescent homes,
> homes for the elderly and the infirm, and the like.

*Field Operations Handbook* § 12g02; *see also* Opinion Letter FLSA, 2004 WL 3177888

(Nov. 30, 2004).  The WHD's interpretation of the Act clearly does not construe it to

exclude a home from enterprise coverage simply because it can be shown that a handful

of the children receiving care in an institution are not mentally ill.

Based on the foregoing, the Court concluded that the ACT Program and its four

homes constitute an enterprise under the Act.  The homes perform related services, are

under common control and have a common business purpose.  28 U.S.C. § 203(r)(i).  The

only remaining question, then, is whether this enterprise is "engaged in commerce" in

which case enterprise coverage exists.  Section 203(s)(1)(B) provides that an enterprise

which is primarily engaged in the care of the mentally ill is, by definition, an enterprise engaged in commerce. The Court's determination that the ACT homes are so engaged mandates the ultimate conclusion that the FLSA overtime provisions apply to defendant's ACT program.

IV.    CGS in Its Entirety Is Not an Enterprise under the FLSA

Despite the Court's conclusion that the ACT program constitutes an enterprise subject to the FLSA's overtime provisions, it does not follow that CGS in its entirety is an enterprise under the Act. As the DOL regulations note: "The enterprise is not necessarily co-extensive with the entire business activities of an employer; a single employer may operate more than one enterprise." 29 CFR § 779.203. Plaintiffs argue, however, that CGS should be treated as a single enterprise because (i) MRDD is engaged in the residential care of the mentally ill, (ii) all of CGS' activities are related to MRDD and subject to common control, and (iii) CGS is operated for a common business purpose. (Pls.' Supp. Mem. 17–20.) Plaintiff also argues that the MRDD, ACT and RA programs combined constitute more than half of CGS's overall budget, staff, and residential facilities, and, therefore, CGS is primarily engaged in the care of the mentally ill and subject to the Act. (Pls.' Supp. Mem. 17, 25.) In making the latter argument, plaintiffs rely in part on the DOL's tests with respect to income and admitted inhabitants that are discussed above. (*Id.* at 21, 22.) Both arguments fail because all of CGS' activities are not related and CGS does not conduct its activities for a common business purpose.

As discussed in detail above, in order for the activities of an employer to be deemed part of a single enterprise those activities must (i) be related, (ii) performed

through common control or unified operation and (iii) for a common business purpose. 29 U.S.C. § 203(r)(1). Plaintiffs contend that all the services performed by MRDD and Congregate Care are "related activities" because the care of the mentally retarded and foster care youth are part of "one mission of caring for the people entrusted to it by the City and State of New York. (Pls.' Supp. Mem. 18.) Plaintiffs rely principally on *Archie v. Grand Central Partnership, Inc.*, 997 F. Supp. 504, 525–26 (S.D.N.Y. 1998), wherein the court found that three interrelated community organizations shared a "dual mission of business improvement and homeless services" and therefore performed related services. However, the court in *Archie* did not address the issue presented in this case, that is, whether services performed without a business purpose (foster care) are related to, and part of a single enterprise with, services that are performed for a business purpose (the care of the mentally ill). The DOL Regulations make clear that they are not:

> [A]ctivities . . . are included in an enterprise only when they are performed for a "business purpose" . . . . [N]onprofit educational, religious, and eleemosynary activities will not be included in the enterprise unless they are of the types which section 3(r), as amended in 1966, declares shall be deemed to be performed for a business purpose.

Consequently, many of CGS's activities are not covered by the Act. Indeed, all services other than the MRDD and ACT programs are not performed for a statutorily recognized business purpose and are not deemed to be related activities. *See* 29 C.F.R. § 779.211 ("Activities which are not related … are not included as part of the enterprise.").

For similar reasons, CGS, as a single entity, does not have a "common business purpose" necessary to establish an enterprise under the third prong of the statutory test. Plaintiff implicitly recognizes this failing when it argues that the test is met because CGS admits that its "common purpose … is serving children, families and people with

retardation, helping people in their time of need."  (Pls. Opp'n Mem. 10; Frien Dep. I at 93:05–93:12.)  Of course, what is required is not a common purpose but a common business purpose.  *See* 29 U.S.C. §§ 203(r)(1)–(2).[5]  None of CGS's activities are performed for-profit.  Therefore, only those activities that are specified in Section 3(r)(2)(A) are recognized as "for a business purpose" for purposes of defining an enterprise.  29 U.S.C. § 203(r)(2)(A).  The vast majority of CGS's activities and programs are conducted for the sole purpose of providing services and/or care to neglected children, and are not considered by Congress to be performed for a business purpose.  Consequently, the constituent parts of CGS, while surely having some common purpose, cannot be said to have a common business purpose that would warrant finding CGS to be a single enterprise under the Act.

V.      Individual Coverage under the FLSA

Under the FLSA's individual coverage provision, any employee "engaged in commerce or in the production of goods for commerce" is covered by the Act, irrespective of whether his employer is an enterprise engaged in commerce as statutorily defined.  29 U.S.C. §§ 206(a), 207(a)(1); *see Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 516–17 (1973).  The parties do not dispute that plaintiffs have not been "engaged in the production of goods for commerce," and so, the issue of individual coverage turns on whether the plaintiffs were or are "engaged in commerce."  According to the DOL's interpretation, employees are engaged in commerce "when they are performing work involving or related to the movement of persons or things (whether tangibles or

---

[5] Plaintiff alternately contends that the care of the mentally retarded (through MRDD) and the care of neglected youth (through Congregate Care) constitute a "common business purpose."  (Pls.' Supp. Mem. 20.)  This definition, while narrower, is equally flawed since the care of neglected youth is not a business purpose under § 203(r), thereby precluding it from being part of a purported common business purpose to "serve" children.

intangibles, and including information and intelligence)" between states. 29 C.F.R. § 779.103. As relevant to the instant action, an employee is engaged in commerce when regularly using the mails and telephone for interstate communication, or when regularly traveling across state lines while working. *Id.*; *see also Joles v. Johnson County Youth Serv. Bureau, Inc.*, 885 F. Supp. 1169, 1178 (D. Ind. 1995) ("An employee may participate in the actual movement of interstate commerce . . . by regularly using the instrumentalities of interstate commerce in her work, *e.g.*, regular and recurrent use of interstate telephone, telegraph, mails or travel."). However, the DOL also notes that

> [t]his does not mean that any use by an employee of the mails and other channels of communication is sufficient to establish coverage. But if the employee, as a *regular and recurrent* part of his duties, uses such instrumentalities in obtaining or communicating information or in sending or receiving written reports or messages, or orders for goods or services, or plans or other documents across State lines, he comes within the scope of the act as an employee directly engaged in the work of 'communication' between the State and places outside the State.

29 C.F.R. § 776.10 (emphasis added). "To be engaged in commerce, a substantial part of the employee's work must be related to interstate commerce." *Boekemeier v. Fourth Universalist Soc'y in the City of New York*, 86 F. Supp. 2d 280, 287 (S.D.N.Y. 2000) (internal quotation marks omitted) (citing *Divins v. Hazeltine Elec. Corp.*, 163 F.2d 100, 103 (2d Cir. 1947)); *Walling v. Jacksonville Paper Co.*, 317 U.S. 564 (1943)).

As such, where an employee's interstate activities are *de minimis*, or not regular or recurring, as a practical matter neither courts nor the DOL consider the employee covered under the FLSA. *See, e.g.*, *Remmers v. Egor*, 332 F.2d 103, 104 (2d Cir. 1964) ("'[S]poradic or occasional shipments of insubstantial amounts of goods' are insufficient to bring an employee within the coverage of the act.") (citing *Mabee v. White Plains Publ'g Co.*, 327 U.S. 178 (1946)); *Lamont v. Frank Soup Bowl*, No. 99 Civ. 12482, 2001

WL 521815, at *2 (S.D.N.Y. May 16, 2001) (citing *Remmers*); *Isaacson v. Penn Cmty. Servs.*, 1970 WL 792, at *4 (D. S.C. Oct. 19, 1970) (discussing "doctrine of *de minimis*" in finding four trips out of state on work-related activities to be "sporadic to say the least"); FOH § 11a01(a) (stating WHD does not assert individual coverage where employee spends "insubstantial amount of time" "on isolated occasions" performing covered work). There is not a clear standard for determining when an individual employee's interstate activities tips the scale and becomes "substantial" for purposes of determining coverage. *See Boekemeier*, 86 F. Supp. 2d at 287 (noting that legal standards are not clear as to what level of activity is "more than sporadic or occasional"). In *Boekemeier*, an employee's use of the phone and mails to accomplish fourteen to thirty major purchases from out-of-state vendors between 1992 and 1997 were considered sufficient to find coverage under the Act. 86 F. Supp. 2d at 287. In *Isaacson*, four trips in nineteen months was insufficient for one plaintiff-employee, whereas frequent trips out of state and consistent use of the mails to send correspondence out of state was sufficient for another plaintiff-employee. 1970 WL 794, at *4, *6. In its handbook, the WHD recognizes that "[i]t is not possible to establish precise guidelines to be followed" on the question of whether individually covered work is insubstantial and isolated. FOH § 11a01(b). The handbook goes on to instruct that

> [i]n view of the remedial purposes of the Act, the application of this [*de minimis*] rule is limited to circumstances where the time consumed by an employee in doing such covered work is obviously trivial, and the incidence of this covered work is so infrequent and out-of-pattern that it would be unrealistic to assert individual coverage solely on such grounds. This must be decided on the facts in a particular case.

*Id.* With respect to out-of-state travel, the DOL similarly recognizes the fact-specific inquiry underlying a determination of individual coverage:

[E]mployees who are *regularly engaged* in traveling across State lines in the performance of their duties (as distinguished from merely going to and from their homes or lodgings in commuting to a work place) are engaged in commerce and covered by the act. On the other hand, it is equally plain that an employee who, in *isolated or sporadic instances*, happens to cross a State line in the course of his employment, which is otherwise intrastate in character, is not, for that sole reason, covered by the act. . . . Doubtful questions arising in the area between the two extremes must be resolved on the basis of the facts in each individual case.

29 C.F.R. § 776.12 (emphasis supplied).

To the extent CGS relies on the non-business/not-for-profit nature of the employer's activities to support its position that plaintiffs are not covered on an individual basis, it is conflating the separate inquiries that apply to enterprise versus individual coverage. (*See* Def.'s Supp. Mem.17–24; Def.'s Reply Mem.7–10.) The WHD clearly recognizes that individual employees of nonprofit organizations who do not engage in substantial competition with other businesses may be covered on an individual basis. *See, e.g.*, Opinion Letter No. FLSA 2005-12NA of Sept. 23, 2005, http://www.dol.gov/esa/whd/opinion/FLSANA/2005/2005_09_23_12NA_FLSA.htm (discussing possibility of individual coverage for employees of a church not engaged in any activity recognized as for a business purpose under the Act); FOH § 11n01 ("Employees of educational, eleemosynary, or nonprofit organizations may be covered on an individual basis. . . . [E]mployees, such as office and clerical personnel, whose work involves the regular use of the interstate mails, telegraph, telephone, and similar instrumentalities for communication across State lines are actually engaged in interstate commerce."). Furthermore, CGS's own counsel advised it that an employer not covered on an enterprise basis may still have employees who are individually covered:

[E]ven if a not-for-profit home is not covered as an enterprise (because more than 50% of those residing in the home are <u>not</u> medically diagnosed

as emotionally disturbed or mentally ill) the home's employees may be covered <u>individually</u> where they "regularly order or receive material from outside the state or regularly communicate across state lines by telephone, telegraph or the mail."

(Letter from Burke, Horan & Macri to Rev. Msgr. Timothy A. McDonnell, COO, Office of Catholic Charities of the Archdiocese of New York (Dec. 27, 1990), Higgins Aff. Ex. A.)

As discussed above, any individual plaintiffs who have worked in ACT homes are covered under an enterprise theory, and therefore entitled to overtime payment for hours worked in an ACT home in excess of forty hours per week. What remains to be resolved is whether plaintiffs not employed (or only partially employed) in ACT homes are covered on an individual basis as a result of the performance of recurrent interstate activities. In this action, there are nine individual plaintiffs: plaintiffs Alberta Bowrin, Hannah Echols, Karen Farley, Glenda Martinez, Shilda Newsome, Dorothy Omaro, and Lisa Rogers (Compl. ¶ 1), and plaintiff intervenors Linda Huff and Fatu Sims (Proposed Intervenor Compl. ¶ 1). All plaintiffs are child care workers who work or have worked in CGS's Staten Island facilities. The parties agreed at oral argument that all the facts necessary to determine individual coverage are on the record. Because plaintiff Newsome and plaintiff intervenor Huff have been exclusively employed in ACT homes, they are both covered under an enterprise theory, and therefore entitled to overtime pay for hours worked in excess of forty in a given week.

Whether the remaining plaintiffs are covered for work done in uncovered homes will require an analysis of their alleged interstate activities to determine (1) whether those activities are of the type covered by the Act, and (2) whether these are performed frequently enough to give rise to coverage under the Act.

First, the Court agrees with defendant's position that distributing personal mail and phone cards to residents in the home, and picking up personal calls for residents that originate out of state, do not constitute the type of use of the mails or channels of interstate commerce sufficient to trigger coverage under the Act.  As discussed above, the DOL does not consider "*any* use by an employee of the mails and other channels of communication" to implicate individual coverage.  29 C.F.R. § 776.10 (emphasis added). Rather, individual coverage may exist when that "use" is "regular and recurrent" and performed to, *inter alia*, obtain or communicate information, or to order goods or services across state lines.  *Id.*  Although neither the substance nor volume criteria triggering individual coverage under the FLSA are well defined, typically it is the use of the interstate mails and placement of out-of-state phone calls occurring in the course of conducting an organization's clerical or administrative business that appear to trigger individual coverage, if "regular and recurrent" and a "substantial part" of the employee's work.  *See id.*; FOH § 11n01.  It is undisputed that plaintiffs' handling of mail and receipt of telephone calls occurred only in the context of distributing mail and relaying calls and messages to residents.  CGS employees cannot be considered to be "using" the mails simply because they physically touch letters that have arrived from out of state for residents in the homes.  Nor does answering calls that happen to originate from out of state constitute "use" of the channels of interstate commerce.  As a matter of common sense, these types of activities do not require an employee to be "directly engaged in the work of 'communication' between the State and places outside the State."  29 C.F.R. § 776.10.

However, the Court does find that plaintiffs' trips into New Jersey and Pennsylvania for shopping and recreation with residents of the homes are interstate activities that may bring an employee within the scope of individual coverage. Traveling across state lines in connection with one's duties clearly implicates coverage under the Act. 29 C.F.R. § 776.10 ("If the employee transports material or equipment or other persons across State lines or within a particular State as a part of an interstate movement, it is clear of course, that he is engaging in commerce. And as a general rule, employees who are regularly engaged in traveling across State lines *in the performance of their duties* (as distinguished from merely going to and from their homes or lodgings in commuting to a work place) are engaged in commerce and covered by the act.") (emphasis added). Clearly plaintiffs' transport of residents out of state for shopping and recreational excursions occurs within the scope of performing their duties. Of course, as discussed above, individual coverage based on out-of-state travel is not found where such travel is infrequent or *de minimis*. *Id.*; *Isaacson*, 1970 WL 792.

A. Alberta Bowrin

Bowrin was employed by CGS as a child care worker from October 2001 through June 2004. (Bowrin Dep. 54:16–54:21, Pls.' Ex. J.) From October 2001 through July 2002, she worked at CGS's regular group home located at 204 Van Pelt Avenue in Staten Island. (*Id.* at 54:14–54:17.) From July 2002 through June 2004 she worked at CGS's other Staten Island–based regular group home at 343 Nicholas Avenue. Bowrin is not covered under an enterprise theory, therefore, because she has never worked in an ACT home.

During the time of her employment, Bowrin drove residents to New Jersey to go shopping on two occasions.  (*Id.* at 85:16–85:19.)  Her other shopping trips with residents occurred in New York, in Staten Island, Brooklyn, or Manhattan.  (*Id.* at 83:09–84:15.)  She also distributed mail to the residents three to four times a week.  (*Id.* at 99:07–101:19.)

The Court finds that two trips out of state for shopping are *de minimis*, and on their own insufficient to support a finding of individual coverage under the Act.  *See Isaacson*, 1970 WL 792, at *4.  Defendant's motion for summary judgment is therefore granted with respect to plaintiff Alberta Bowrin.

### B.  Hannah Echols

Echols has been employed as a child care worker by CGS since 1998.  (Compl. ¶ 18.)  She has worked in homes in the Bronx, Brooklyn, and Staten Island, New York.  (*Id.* at ¶ 18.)  According to her testimony, she has worked in the following homes:  200 Grandview in 1998 (Echols Dep. 9:16–9:18); 311 Clawson in 2002 (9:20–9:22); Davidson Avenue in the Bronx in 2002 (9:24–10:03); 204 Van Pelt Avenue from 2003 to present (10:05–10:07); and then "other houses . . . over time" identified as 343 Nicholas Avenue, 345 Nicholas Avenue, 202 Van Pelt Avenue, Herberton, and Malcolm X (10:09–10:22).  Of these houses, it appears that only 345 Nicholas Avenue and Herberton Avenue are ACT homes.  (*See* Burky Decl. Ex. A (containing chart of homes by type).)  There is some dispute between the parties with respect to the nature, frequency, and timing of her work-related travel out of state.  (*Compare* Pls.' 56.1 Statement ¶¶ 46–47, *with* Def.'s 56.1 Opp'n Statement ¶¶ 25–28.)  However, Echols's testimony, which defendant does not allege to be false, reflects that since 2000 or 2001, she has made five

trips out of state (to New Jersey and Pennsylvania) on recreational or shopping excursions with residents. (*See* Pls.' Ex. TT.) She also testifies to having received phone calls from out of state approximately two times a month between 1999 and 2000, and six or seven times in late 2004. (*Id.*)

To the extent plaintiff Echols was employed in an ACT home and worked in excess of forty hours in a single week in that home, she is entitled to overtime pay under an enterprise theory. However, for the work she performed in a non-covered home, she is not covered on an individual basis, because the Court finds five trips since 2000 or 2001 to be *de minimis*. Defendant's motion for summary judgment on the issue of individual with respect to Hannah Echols is therefore granted.

### C. Karen Farley

From 2001 to 2002, Farley worked at the regular group home at 202 Van Pelt Avenue. (Farley Dep. 9:11–9:20) From 2002 to present, she has worked in the ACT home located at 345 Nicholas Avenue. (*Id.*) Since February 2001, Farley recalls one trip to New Jersey with residents for recreation, one or two shopping trips in New Jersey, and three trips through New Jersey to reach destinations in the Bronx and upstate New York. (Farley Dep. 66:05–69:25, Pls.' Ex. L.) Farley also traveled through New Jersey from Staten Island to reach a week-long training in Manhattan. (*Id.* at 71:07–72:14.)

Again, to the extent Farley has worked in excess of forty hours in a single week while employed in an ACT home, she is entitled to overtime pay. However, in the absence of evidence as to the number of out-of-state trips taken prior to her employment in an ACT home in 2002, there is no factual basis to support a finding of individual coverage for work performed in an otherwise uncovered home. Defendant's motion of

summary judgment on the issue of individual coverage with respect to Farley is therefore granted.

### D. Glenda Martinez

Martinez was employed by CGS between April 2002 and September 2004. (Martinez Decl. ¶ 2, Pls.' Ex. RR; Martinez Dep. 18:16-18:19, Pls.' Ex. N.)  From April 2002 until February 2003, Martinez worked in a regular group home in Staten Island. (Martinez Decl. ¶ 2.)  From February 2003 through September 2004, she worked in an ACT home.  (*Id.* at ¶ 3.)  In September 2004 she was transferred to a different regular group home, where she worked for three weeks before leaving her employment at CGS. (*Id.* at ¶ 4.)

During her employment, Martinez transported residents from Staten Island to New Jersey one time for a recreational activity, and two to four times per month to shop. (Pls.' 56.1 Statement ¶ 54.)  Martinez also transported a resident to a group home in upstate New York, and drove through New Jersey to get there.  (*Id.*)  The parties dispute the remainder of Martinez's alleged interstate activities, including the purchase of a bus ticket for a resident to travel to Maryland, the receipt of out-of-state telephone calls, and her handling of mail within the home.  (*Compare* Pls.' 56.1 Statement ¶¶ 55–57, *with* Def.'s 56.1 Opp'n Statement ¶¶ 33–35.)

Martinez is covered on an enterprise basis for the period of February 2003 through September 2004, during which time she was employed in an ACT home. Furthermore, the Court finds that she is also covered on an individual basis during the time she was employed in a regular group home.  Two to four trips per month out of state to shop with residents are frequent enough to bring Martinez under the Act's coverage.

The disputed activity with respect to phone calls and mail, as discussed above, are not considered in determining whether Martinez is covered on an individual basis. Plaintiffs' motion for summary judgment on the issue of individual coverage with respect to Martinez is therefore granted.

### E. Dorothy Omaro

Omaro has been employed by CGS as a child care worker for about eight years. (Omaro Dep. 7:20–7:22, Pls.' Ex. P.) With the exception of working a day or two at a different home since February 2001, Omaro has worked in one of the Staten Island regular group homes the entire time. (*Id.* at 7:20–8:09.) Since February 2001, she has traveled from Staten Island to New Jersey for shopping on one occasion, and at least twice for recreation with the residents. (Pls.' 56.1 Statement ¶ 63.) She answers the phone and sometimes places calls as part of her job. (Omaro Dep. 29:24–30:03.)

Omaro's interstate activities, three trips since 2001, are insufficient to trigger individual coverage under the Act. Defendant's motion for summary judgment on the issue of individual coverage with respect to Omaro is therefore granted.

### F. Lisa Rogers

Rogers worked as a child care worker for CGS from September 20, 2002 until March 19, 2003. (Rogers Decl. ¶¶ 2–5.) From September 20, 2002 through February 24, 2003, she worked in an ACT home in Staten Island. (*Id.* at ¶ 2.) From February 24, 2003 until the end of her employment, she worked in a regular group home. (*Id.* at ¶¶ 3–4.)

For hours worked in excess of forty hours in a single week while employed in an ACT home, Rogers is entitled to overtime pay. She does not allege that she has engaged in any interstate activity, and indeed she only worked in an uncovered home for a few

weeks.  Defendant's motion for summary judgment on the issue of individual coverage with respect to Rogers is therefore granted

## G.  Fatu Sims

Sims has worked as a child care worker for CGS since March 2001.  (Sims Dep. 11:08–11:23, Pls.' Ex. R.)  From 2001 to 2002 she worked in a regular group home.  (*Id.*)  Then, between 2002 and 2003, she worked at an ACT home.  (*Id.*)  From 2003 to present, she has worked back in the original regular group home.  (*Id.*)  The parties dispute the frequency of Sims's trips into New Jersey for work-related excursions.  (*Compare* Pls.' 56.1 Statement ¶ 71, *with* Def.'s 56.1 Opp'n Statement ¶ 41.)  However, Sims's testimony that she traveled once a week from the group home in Staten Island to New Jersey to shop for food and other items for residents and the home is not in dispute. (Sims Dep. 27:19–27:23.)  In 2003, she once drove residents to a New Jersey hospital. (Def.'s 56.1 Opp'n Statement ¶ 42.)

Sims is covered on an enterprise basis for the period of time during which she was employed in an ACT home.  Furthermore, the Court finds that she is also covered on an individual basis during the time she was employed in a regular group home.  Weekly trips to New Jersey are regular and recurrent enough to bring Sims under the Act's coverage. Plaintiffs' motion for summary judgment on the issue of individual coverage with respect to Sims is therefore granted.

## VI.  Liquidated Damages Analysis

Under the FLSA's damages provision, an employer found to have violated Section 7 of the Act "shall be liable to the employee or employees affected in the amount of their unpaid . . . overtime compensation, . . . and in an additional equal amount as

liquidated damages." 29 U.S.C. § 216(b). Section 16(b)'s use of the term "liquidated

damages" is considered "something of a misnomer," *Reich v. Southern New England

Telecomms. Corp.*, 121 F.3d 58, 71 n.4 (2d Cir. 1997) [hereinafter *SNET*], because they

"are not a penalty exacted by the law, but rather compensation to the employee

occasioned by the delay in receiving wages due caused by the employer's violation of the

FLSA," *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999) (citing

*Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583–84 (1942)). However, the

Portal-to-Portal Act, designed specifically to protect employers from immense and

unexpected liabilities, *see* 29 U.S.C. § 251(a), provides the following defense:

> [I]f the employer shows to the satisfaction of the court that . . . [its failure
> to pay overtime wages] was in good faith and that he had reasonable
> grounds for believing that his act or omission was not a violation of the
> [FLSA], the court may, in its sound discretion, award no liquidated
> damages . . . .

29 U.S.C. § 260. The employer carries the burden of "establishing, by 'plain and

substantial' evidence, subjective good faith and objective reasonableness." *SNET*, 121

F.3d at 71 (citing *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir. 1991)).

This burden is a "difficult one, with double damages being the norm and single damages

the exception." *RSR Security*, 172 F.3d at 142 (citation omitted); *see also SNET*, 121

F.3d at 71 (citing *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir.

1986) ("Doubling [damages under the FLSA] is not some disfavored 'penalty.' [The

Portal-to-Portal Act] made doubling discretionary rather than mandatory, but it left a

strong presumption in favor of doubling, a presumption overcome only by the employer's

'good faith . . and reasonable grounds for believing that [the] act or omission was not a

violation'") (bracketed language in original)). The defense of good faith requires

"evidence of at least an honest intention to ascertain what the Act requires and to comply with it." *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987). The employer must show more than that it did not "purposefully violate the provisions of the FLSA to establish that it acted in good faith." *SNET*, 121 F.3d at 71.

Over the years, CGS has sought advice of counsel with respect to whether it was subject to the FLSA's overtime provisions. John Frein, CGS's Executive Director, testified that as a matter of general policy, CGS would consult with attorneys to ensure compliance with the law. (Frein Dep. I at 103:16–107:18, 109:08–109:19, 111:21–112:14; Frein Dep. II at 183:02–184:20.) Specific details about conversations with counsel and the type of information provided to counsel is absent from the record. (*See id.*) CGS also spoke with other professionals in the foster care industry about FLSA coverage. (Higgins Aff. ¶¶ 10–11.) Frein and Higgins (former Director of Human Resources) attended a Personnel Directors' Meeting sponsored by Catholic Charities in 1980, where coverage under the FLSA was discussed. (Frein Aff. ¶ 15; Higgins Aff. ¶ 8.) CGS also attends meetings for personnel and human resources professionals where FLSA coverage is discussed. (Higgins Aff. ¶¶ 4–5.) CGS also relied on memoranda from counsel and advice from its peers. (*See* Higgins Aff. Exs. A, B, C, D.) The parties do not dispute that CGS engaged in the inquiries and conversations recounted here, but rather whether these inquiries sufficed as a matter of law for purposes of sustaining a good faith defense to liquidated damages under Section 216(b) of the Act.

Defendant gives eight bases for finding that it acted in good faith and had reasonable grounds for believing it was not required to pay an overtime premium. First, CGS argues that when the DOL audited it in 1984 and concluded that the MRDD

program employees should be paid overtime, it did *not* make a similar finding for CGS's other programs, "including the programs in question." (Def.'s Supp. Mem. 28; Frein Aff. ¶ 9.) Second, CGS argues that it "periodically monitored" whether changes in its programs would affect its coverage under the FLSA. (*See* Frien Dep. II at 184:09– 184:14.) Third, CGS sought advice from counsel in determining whether the FLSA applied. (*See* Frien Aff. ¶ 19.) Fourth, CGS argues that it discussed FLSA coverage with its peers, and is not aware of any similarly situated employers in the industry paying an overtime premium to employees similarly situated to plaintiffs. (*See* Higgins Aff. ¶¶ 11– 12.) In addition, CGS argues it relied on materials distributed at a Catholic Charities meeting for personnel directors which stated that "Employers of non-profit institutions caring for neglected and dependent children are <u>not</u> covered by [the overtime provisions of the] FLSA provided the institution is not operated in conjunction with a hospital, covered institution [or] school." (Def.'s Supp. Mem. 29 (citing Letter from Brian Coughlin to Personnel Directors (Apr. 8, 1980) ("Coughlin Letter"), Higgins Aff. Ex. C) (emphasis and bracketed language in original).) Fifth, CGS argues it relied on national industry organizations, like the Child Welfare League of America, Inc., which allegedly opined that "institutions similar to CGS were not required to pay an overtime premium." (Def.'s Supp. Mem. 30.) Sixth, CGS argues that its provision of retroactive wage increases to its employees (including plaintiffs) is circumstantial evidence of its good faith because had it believed it was violating the overtime provision, it would have used the money for overtime instead. (*See* Frien Aff. ¶ 26.) Seventh, CGS claims it relied on a collective bargaining agreement negotiated with a union organizing some of CGS's employees in 1991 that did not include any demand for overtime. Finally, it argues that

governmental reimbursement rates in programs other than the MRDD program do not contemplate that employees similarly situated to plaintiffs be paid an overtime premium. (*See* Breidenbach Aff. ¶ 9.) Defendant argues this raises an inference that the governmental agencies that fund CGS's programs recognize an exemption under the FLSA. (Def.'s Supp. Mem. 30.) More generally, CGS argues that a demonstration of good faith is "more easily received" when there is a novel, confusing or uncertain area of FLSA coverage at issue.

The Court finds these arguments unavailing, and will address them seriatim.

First, while CGS is correct that courts may find that an employer acted in good faith where it relied on representations made by the DOL (*see* Def.'s Supp. Mem. 27 (citing cases)), CGS's argument that it relied on the fact that the DOL did not find "the programs in question" (Def.'s Supp. Mem. 28) to be covered by the FLSA is misplaced. The ACT program did not begin until around 2002. That the DOL did not find it was subject to enterprise coverage in 1984 is therefore hardly surprising, nor does it constitute evidence of good faith.

Defendant's second and third arguments regarding its efforts to monitor coverage and consult with counsel may be addressed together. While it is undisputed that CGS had conversations with counsel generally about coverage under the Act, defendant does not proffer evidence that it discussed in detail the nature of services provided in ACT homes or the nature of the population those homes serve. *See Debejian v. Atl. Testing Labs., Ltd.*, 64 F. Supp. 2d 85, 91–92 (N.D.N.Y. 1999) (noting that where employer improperly exempted a particular employee that general inquiries to counsel were not sufficient, and specific details respecting that employee ought to have been disclosed to counsel).

Although CGS relies heavily on its executive director John Frein's testimony with respect to its good faith defense (Def.'s Supp. Mem. 28–30; Def.'s Reply Mem. 11–12; Def.'s Opp'n Mem. 7–8), other than generally testifying that "because it was a different program, it was discussed" (Frien Dep. I at 116:17–117:04) he did not recall personally having any specific conversations with counsel that discussed the ACT program in any detail (Frien Dep. II at 211:25–213:13). Defendant produces no specific evidence of conversations with counsel or work product from counsel on the issue of whether the ACT program would subject it to FLSA coverage when it was commenced in 2002 or thereafter. Moreover, the advice it received from counsel prior to 2002 pointed to the likelihood that a program such as the ACT program would be covered.. (*See* Pls.' Ex. MM.) In 1990, CGS's lawyers, Burke, Horan & Macri, drafted a memorandum outlining general FLSA coverage issues. (*Id.*) In its discussion of enterprise coverage, the memorandum specifically noted that whether an institution is "primarily engaged in the care of . . . the mentally ill or defective" will be "determined by the degree to which the home provides medical care or therapy to residents." (*Id.* at 12.) It cites a 1978 DOL advisory opinion which states:

> [I]f a psychiatrist retained by a home for neglected children regularly provides therapy or treatment to more than 50% of the home's residents, then the home is covered because it primarily engages in the care of the emotionally disturbed or mentally ill. . . . "[C]aring for the mentally ill" requires an actual medical diagnosis that the patient is mentally sick or deficient.

(*Id.*) In light of this advice, it would have been reasonable for CGS, when developing a program in 2002 designed to "deliver[] the equivalent of the hospital's comprehensive services directly to the adolescent" (*ACT Staff Manual*), to take steps to "ascertain what the Act requires" at that time, *Wilamowsky*, 833 F.2d at 19; *see also SNET*, 121 F.3d at 72

(finding that even though the employer took some efforts to ascertain its obligations under the Act because it sought advice from the DOL, the resulting opinion letter revealed that the employer "failed to ask the appropriate question" and did not compel a finding of good faith); *Debejian*, 64 F. Supp. 2d at 91 (holding that where employer did not show it furnished counsel with the specific information necessary to determine coverage, it had not met its "onerous" burden of demonstrating good faith).

Defendant's fourth and fifth arguments, regarding industry standards and the advice and conduct of similarly situated employers, may also be addressed together. As an initial matter, acting "in accord with prevailing industry practice" is insufficient to establish a good faith defense to liquidated damages. *SNET*, 121 F.3d at 71. In addition, by defendant's own admission, it is not aware of any other child welfare program that operates homes similar to ACT, so the overtime practices of other child welfare programs are not probative evidence of good faith. (Longley Dep. 82:04–82:06.) Defendant's reliance on the Catholic Charities materials also does not provide evidence of good faith or reasonableness. Defendant cites a letter for the proposition that nonprofit institutions caring for neglected children are not covered. (Def.'s Supp. Mem. 29 (citing Coughlin Letter).) The sentence immediately following the cited language states: "However, in an Agency where more than 50% of the residents of the institution are emotionally disturbed, the employees are covered by the Wage & Hour provisions of the FLSA" (Coughlin Letter). If anything this letter supports the position that it is widely known in the child welfare community that a home where at least half the residents are "emotionally disturbed" triggers FLSA coverage, cutting against defendant's position that good faith may be more easily found where the law is extremely complex or unsettled. In

addition, the letter was written in 1980, years before the establishment of the ACT

program.  Finally, defendant's argument with respect to statements made by the Child

Welfare League are similarly unpersuasive.  The letter from the Child Welfare League on

which CGS relies contains the following language:

> Where more than 50 percent of the residents of an institution providing
> residential care for emotionally disturbed children are referred to the
> institution by a psychiatrist, psychologist or physician, or where after a
> referral, a psychiatrist, psychologist or physician has ascertained that more
> than 50 percent of the residents of the institution are emotionally
> disturbed, the employees of such institution are covered by the wage and
> hour provisions of the Fair Labor Standards Act, as amended.  Where
> children have been referred by a public welfare agency or a Court, the
> employees of the institution will be considered covered by the wage and
> hour provisions of the Act.

(Letter from William G. Lunsford, Director of Child Welfare League of America, Inc., to

Betty Murphy, Administrator, Wage & Hour Div., U.S. Dep't of Labor (July 12, 1974);

Higgins Aff. Ex. D.)  As with the Catholic Charities letter, this letter put CGS on notice

that the ACT program's large percentage of mentally ill residents might trigger enterprise

coverage under the FLSA.

CGS's sixth argument, regarding its decision to use additional funds to provide

retroactive wage increases to its employees, is not direct evidence of good faith because it

does not go to the sufficiency of defendant's attempt to ascertain the Act's requirements

or compliance.

CGS's seventh argument relates to a collective bargaining agreement from 1991

that did not include a demand for overtime.  CGS relies on the Third Circuit case *Brooks

v. Village of Ridgefield Park*, 185 F.3d 130 (3d Cir. 1999), for the proposition that a court

may find an employer acted in good faith where it relied on the "demands of the

employees' collective bargaining representative made in good faith bargaining" (Def.'s

Supp. Mem. 27–28).  In *Ridgefield Park*, however, the basis of the plaintiffs' complaint was the defendant's practice of separating overtime pay and allowing it to accumulate. 185 F.3d at 139.  It adopted this practice pursuant to the plaintiffs' *own* request during the course of collective bargaining.  *Id.*  The collective bargaining agreement defendant relies on here is clearly distinguishable.  Further, because the negotiations took place over ten years before the ACT program began, that the employees' demands at that time did not include a demand for overtime is hardly compelling evidence of good faith on the part of CGS.

Finally, defendant's eighth argument is that because government reimbursement rates do not contemplate the payment of overtime in CGS's non-MRDD programs, those agencies recognize an exemption under the FLSA.  There is no evidence to support this inference.  As plaintiffs correctly point out, reimbursement rates may simply "reflect what the government agencies have been told by CGS about its wage practices."  (Pls.' Opp'n Mem. 22.)

For the foregoing reasons, the Court grants plaintiffs' motion for summary judgment on the issue of liquidated damages.

VII.    FLSA's Limitations Provision

An employer who has violated the FLSA must pay unpaid wages for two years from the filing of the action, unless the employer has "willfully" violated the Act, in which case unpaid wages are due for three years.  29 U.S.C. § 255(a).  Plaintiffs seek summary judgment on the question of whether the three-year statute of limitations should apply.  Plaintiffs bear "the burden of proving 'that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'"

*Debejian*, 64 F. Supp. 2d at 92 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 139 (1988)).  "Willfulness cannot be found on the basis of mere negligence or 'on a completely good faith but incorrect assumption that a pay plan complied with the FLSA in all respects.'"  *Boekemeier*, 86 F.Supp. 2d at 288 (citing *McLaughlin*, 486 U.S. at 135).

Plaintiffs have not presented evidence that CGS *knew* it was violating the FLSA. While it has been established that CGS did not "take sufficient steps to ensure compliance with the FLSA," it did make some effort to ascertain whether it was entitled to an exemption.  *Debejian*, 64 F. Supp. 2d at 92.  Therefore, the Court finds that CGS's violation of the overtime provisions of the FLSA do not rise to the level of willfulness, and grants CGS's motion for summary judgment on this issue.

VIII.   Plaintiff Rogers's Claim for Breach of Contract

Rogers also asserts a separate claim for breach of contract.  (Compl. ¶¶ 49–50.) The basis for this claim is Rogers's assertion that the CGS employment manual states that during an initial six-month probationary period for new employees, CGS or the employee may terminate employment by giving two weeks' written notice.  (Catholic Guardian Society, *Manual of Personnel Policies* 9 (Feb. 5, 1997), Pls.' Ex. U.)  CGS "may elect to pay two weeks salary in lieu of notice."  (*Id.*)  Defendant acknowledges that this policy is applicable to all staff (Higgins Dep. 87:09–87:19) and that no amendments have been made to the policy that, absent notice, CGS will pay two weeks' salary to terminated probationary employees (*see id.* at 85:15–90:02).  Rogers was terminated without notice or two weeks' salary.  (Rogers Decl. ¶¶ 5–6.)

In response to Rogers's contract claim, CGS makes two arguments to support its dismissal.  First, CGS argues that Rogers's employment was at-will and freely terminable.  (Def.'s Supp. Mem. 32.)

Defendant is correct that under New York law, "[u]nless an employment is for a specified period, it is presumed to be an employment at will, which may be freely terminated at any time and for any reason or even no reason."  *Nice v. Combustion Engineering, Inc.*, 599 N.Y.S.2d 205, 206 (N.Y. App. Div. 1993) (citing *O'Connor v. Eastman Kodak Co.*, 65 N.Y.2d 724, 725 (N.Y. 1985); *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 300 (N.Y. 1983); *Collins v. Hoselton Datsun*, 503 N.Y.S.2d 203 (N.Y. App. Div. 1986)).  "'[A]bsent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment, an employer's right to terminate an employment at will remains unimpaired.'"  *Nice*, 599 N.Y.S.2d at 206 (quoting *Murphy*, 58 N.Y.2d at 305).  New York courts have acknowledged that an employment at-will may be limited by an agreement that an employee be dismissed only under certain circumstances, such as those provided in the employer's handbook.  *See, e.g.*, *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458 (N.Y. 1982); *Grozek v. Ragu Foods, Inc.*, 406 N.Y.S.2d  213 (N.Y. App. Div. 1978); *Wernham v. Moore*, 432 N.Y.S.2d 711 (N.Y. App. Div. 1980).  Rogers, however, fails to make any showing that the personnel manual creates an implied term of employment in this case.

Second, CGS argues that any breach of contract claim is barred by Article 78's four-month statute of limitations.  N.Y. C.P.L.R. 217 (McKinney's 2003).  The parties agree that a claim against a non-profit corporation for a breach of its own rules is properly brought pursuant to Article 78.  *See Gertler v. Goodgold*, 487 N.Y.S.2d 565,

570 (N.Y. App. Div. 1985). Article 78 makes a writ of mandamus applicable to corporations both public and private as a quasi-governmental body. *Gray v. Canisius Coll. Bd. Of Buffalo*, 430 N.Y.S.2d 163, 166 (N.Y. App. Div. 1980). A corporation may "be compelled in an article 78 proceeding to fulfill not only obligations imposed upon them by state or municipal statutes but also those imposed by their internal rules." *Id.* To the extent Rogers's claim seeks mandamus relief, that claim will be governed by the standards of review under Article 78, and subject to its statute of limitations. Article 78's statute of limitations requires that any petition pursuant thereto be presented within four months of the alleged breach. N.Y. C.P.L.R. 217.

In response to CGS's statute of limitations argument, plaintiff argues that "where a duty imposed prior to a limitations period is a continuing one, the statute of limitations is not a defense to actions based on breaches of that duty occurring within the limitations period." (Pls.' Opp'n Mem. 24 (citing *Condo Units, LP v. New York State Div. of Housing & Comm'y Renewal*, 771 N.Y.S.2d 380 (N.Y. App. Div. 2004). Plaintiff argues that Rogers does not challenge the discrete action of her termination but rather CGS's "continuing failure" to pay her two weeks' severance pay. This argument misconstrues the continuing violation doctrine, which allows a plaintiff to challenge and seek relief from all conduct that is part of the same course of unlawful activity. *See, e.g.*, *Bartman v. Shenker*, 786 N.Y.S.2d 696 (N.Y. Sup. Ct. 2004) (discrimination); *State v. CSRI Ltd. P'ship*, 734 N.Y.S.2d 626 (N.Y. Sup. Ct. 2001) (environment). Plaintiff cites to no case law supporting a position that a duty to make a one-time severance payment can be construed to be a continuing violation for purposes of tolling a statute of limitations.

## CONCLUSION

Consistent with the foregoing, plaintiffs' motion for summary judgment [37] is granted in part, and denied in part, and defendant's motion for summary judgment [51] is granted in part and denied in part.

SO ORDERED

Dated:     New York, New York
           March 2, 2006

                                        Richard J. Holwell
                                        United States District Judge